# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| Information that is stored at Premises controlled by Google | ) ) Case No. ___20-9ı6M(NJ)___ |
| | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The search is related to violations of: 18 USC § 1201 (a)(1), (g) (Kidnapping); 18 USC § 2422(b) (Coercion and Enticement); and 18 USC § 2423(a) (Transportation of Minors), (the "Subject Offenses")

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

___Melissa A. Fus, DOJ-DCI___
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 3/2020 _____

_____
*Judge's signature*

City and State: __Milwaukee, Wisconsin__

___Honorable Nancy Joseph___, U.S. Magistrate Judge
*Printed Name and Title*

# APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

I, Melissa A. Fus, being first duly sworn, depose and state as follows:

## <u>INTRODUCTION</u>

1.     I am a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) and have been in law enforcement since 2003.

2.     I am currently assigned to the Human Trafficking Bureau for the Wisconsin Department of Justice and the Federal Bureau of Investigation Wisconsin Human Trafficking Task Force ("WHTTF").  My duties as a Special Agent with the WI DOJ-DCI include human trafficking investigations involving minors and adults.  I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.

3.     The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider to be truthful and reliable.  Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

4.     The facts set forth in this affidavit are based on my personal knowledge, the knowledge obtained during my participation in this investigation, the knowledge obtained from other individuals, including other law enforcement personnel, review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  This affidavit is intended to show there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) for information associated with Google, LLC accounts and Internet Protocol ("IP") addresses that accessed Google, LLC servers for the time period from July 1, 2019 at 12:00 a.m. (UTC) through July 9, 2019 at 11:59 p.m. (UTC) AND from September 27, 2019 at 12:00 a.m. (UTC) to October 3, 2019 at 11:59 p.m. (UTC) to conduct searches that included the search terms:

> N694 CTH J
> Melissa Vasguez
> Melissa Vasquez Gonzalez
> Estrellita Gonsalez
> 920-375-6503

The terms listed above are not case sensitive.  Such information is stored at premises owned, maintained, controlled, or operated by Google LLC, an electronic communication service provider located in Mountain View, California.  The information to be searched is described in the "Search Procedure" section below.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that unknown persons have committed violations of 18 USC § 1201 (a)(1), (g) (Kidnapping); 18 USC § 2422(b) (Coercion and Enticement); and 18 USC § 2423(a) (Transportation of Minors), (the "Subject Offenses").  There also is probable cause to search the requested information for evidence, contraband, fruits, and/or instrumentalities of the Subject Offenses in accord with the search procedures given below.

7.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction."  18 U.S.C. §§ 2703(a) and 2711.

**THE SERVICE PROVIDER**

8.     I have learned the following about Google:

a. Google offers email services to the public. In particular, Google allows subscribers to maintain email accounts under the domain name gmail.com. A subscriber using Google's services can access his or her email account from any computer connected to the Internet.

b. Google maintains the following records and information with respect to every subscriber account:

i. *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Google's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on Google's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

ii. *Address book*. Google allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. *Subscriber and billing information*. Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. Google also maintains records concerning the date on which the account was created, the IP address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

3

iv.    *Device Information.*    Google collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC (media access control) addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Android ID, Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

v.    *Cookie Data.*    Google uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account.  One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

vi.    *Transactional information.*    Google typically retains certain transactional information about the use of each account on its system.  This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through Google's websites).  Google retains information regarding accounts registered from the same IP address.

vii.    *Customer correspondence.*  Google typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or

complaints concerning the subscriber's account.

        viii.      *Preserved and backup records.* Google maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). Google may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

      c.      In addition, Google maintains records with respect to other Google Services, which it stores in connection with subscriber accounts, which typically include the following:

        i.      *Google Drive content.* Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

        ii.      *Google Docs.* Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs." Users can use Google Docs to create online documents that can be stored on, or saved to the user's Google Drive.

        iii.      *Google Photos.* Google provides users with a certain amount of free storage for photographs, through a service called Google Photos, which allows users to manually store photographs and videos, and which automatically uploads

5

photographs and videos taken by registered mobile devices. Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Google Photos. This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

        iv.      *Google Calendar*. Google provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

        v.      *Google Chats and Google Hangouts content*. Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content. Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

        vi.      *Location History data*. Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google. For example, Google collects information collected from GPS (global positioning system), Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

6

vii. *Google Payments*. Google allows for the storage of payment information associated with a Google Account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

viii. *Chrome Browser and Search History*. Google stores information regarding user Internet browser activity when a Google user is logged into his or her account, which includes logging information about websites viewed by the user, Internet search queries in the Google Internet search engine available at http://www.google.com, and also maintains lists of bookmarks maintained by the user so that he or she can quickly access frequently viewed websites.

ix. *Advertising Data.* Google also stores advertising data, including information regarding unique advertising IDs associated with the customer, devices used to access the account, application IDs, Android IDs, advertising cookies, Unique Device Identifiers (UDIDs), payment information, ads clicked, and ads created.

9. Of particular relevance to this requested search warrant, Google can identify any Google accounts that were logged in and searched for specific search terms in a specific time period using Google's search engine. In addition, and even if the individual who conducted the search was not logged into a Google account at the time, Google can identify any IP addresses that accessed Google's search engine and searched for specific search terms in a specific time period. However, because Google's data ages off over time, Google may not be able to provide the entire IP address (*e.g.*, 1.2.3.4), and may only be able to provide a partial IP address (*e.g.*, 1.2.3.X). Finally, for each account and/or IP address that was used to conduct a search for the relevant search term within the relevant time period, Google maintains records of CookieIDs. According to Google, these are

7

identifiers that are used to group together all searches conducted from a given machine, for a certain time period. Such information allows investigators to ascertain, even when the user is not logged into a Google account, whether the same individual may have conducted multiple pertinent searches.

**PROBABLE CAUSE**

### A. Initial Report by Calumet County Sheriff's Department

10. In February 2020, I became a case agent on an investigation concerning a juvenile victim (hereinafter JV-1) (DOB XX/XX/2004) who was reported missing in July 2019. I obtained the following information from reviewing reports by officers with the Calumet County Sherriff's Department and conversations with the lead investigator, Calumet County Detective Sergeant Jacob Meyer.

11. On July 7, 2019, at approximately 8:48 p.m., Deputy John McGuire of the Calumet County Sheriff's Office was dispatched to a missing juvenile report and contacted JV-1's mother and older brother at their residence in New Holstein, WI. Upon arrival, Deputy McGuire spoke with JV-1's mother and younger brother. JV-1's mother reported that JV-1 was last seen at the residence on July 7, 2019 at 10:00 a.m. JV-1's mother stated JV-1 had recently moved to their residence from Mexico in May 2019. JV-1's mother said JV-1 does not have any friends or family members in the area, nor does she have any ties to the community or attend school. JV-1's mother reported that she was not sure where JV-1 would go and that she was concerned about JV-1.

12. JV-1's mother stated she had been texting JV-1 prior to JV-1 disappearing, and during those communications, there were no indications that JV-1 had plans to leave nor were they in any sort of an argument. JV-1's mother also said she believed that JV-1 had left the residence without packing clothing, as JV-1's mother did not notice any clothing missing. JV-1's mother noticed that JV-1 left with $300.00 that JV-1 had earned from working on a farm.

13.    JV-1's brother (XX-XX-2005) indicated that JV-1 was an avid gamer and would frequently play a first person shooter game on her phone.  JV-1's brother did not know JV-1's account information or avatar for the game.

14.    JV-1's mother said JV-1 always had her phone on and has unlimited data.  JV-1's mother provided JV-1's phone number as 920-375-XXXX with Sprint.  Calumet County Dispatch attempted an emergency ping on JV-1's phone number and was advised that the phone was turned off with negative results on a location of the phone.

15.    Deputies searched JV-1's residence, the other apartments located in the same four-unit building, surrounding buildings/property, and JV-1's mother's employer's farm as JV-1 work with her mother occasionally at the farm.  Deputies were unable to locate JV-1.

**B.    Interview with JV-1's Neighbor**

16.    On July 7, 2019, Calumet County Sheriff Deputy McGuire spoke with the neighbor of JV-1 and her family.  JV-1's neighbor, an adult male, provided the following information.  At approximately 11:30 a.m., JV-1's neighbor was outside at the apartment building and observed JV-1 approach a red-colored vehicle that was parked near the residence.  JV-1's neighbor said JV-1 stood outside of the red vehicle and conversed with the male driver for a few minutes.  JV-1's neighbor then observed JV-1 return inside of her residence.  After approximately one to two minutes JV-1 returned to the vehicle carrying a small drawstring backpack on her shoulder.  JV-1's neighbor then observed JV-1 enter the red vehicle and leave the residence.  JV-1's neighbor said he believed JV-1 seemed casual and comfortable with the male driver, so the neighbor had assumed it was a relative.  JV-1's neighbor said that he could not understand the conversation between the driver and JV-1 as it was in Spanish.

17.    JV-1's neighbor described the suspect vehicle as a red four-door sedan, less than ten years old, and possibly a Toyota Camry or Mazda-type vehicle.  JV-1's neighbor said the license plate

on the suspect vehicle was an out of state license plate with the colors red and white, along with a border around the plate that had Spanish writing. JV-1's neighbor also described the plate to have a chrome frame, which appeared to be a dealership frame. JV-1's neighbor said the vehicle was occupied with only the driver who was described as a Hispanic male, approximately 50 years of age, with gray hair.

### C. Facebook Information

18. On July 7th, 2019, Calumet County Sheriff's Deputy William Pearson received Facebook information from JV-1's brother. JV-1's brother provided JV-1's Facebook account as "Ëstrëllîtä Gönsälëz," "www.Facebook.com/estrellita.gonsalez.92798".

19. On July 8th, 2019, at approximately 1:45 p.m., during a follow-up interview with JV-1's mother, Calumet County Sheriff's Department Deputy Leslie Lemieux witnessed JV-1's mother receive a phone call from Facebook account "Ëstrëllîtä Gönsälëz." Deputy Lemieux indicated JV-1's mother and JV-1 had a short conversation in Spanish so Deputy Lemieux only understood some words from the phone conversation. Deputy Lemieux indicated that she heard the female on the phone crying and repeatedly saying "por favor" (Spanish for "please"), and JV-1's mother responded with "no" and "policia" (Spanish for "police"). JV-1's mother identified the female on the phone as being JV-1. JV-1's mother told Deputy Lemieux that JV-1 had told her that she did not want to come home, so JV-1's mother told JV-1 that she reported her missing with the police. JV-1 had ended the phone call without providing information about where or who she was with.

20. JV-1's mother added that she had discovered that JV-1 had not taken her cell phone with her. JV-1's mother and brother had located JV-1's phone in the residence after their initial conversation with law enforcement.

21. On July 16, 2019, Calumet County Sheriff Department Sergeant Investigator Jacob Meyer received records from Facebook, Inc. in response to a search warrant approved by the Calumet

County Circuit Court on July 10, 2019. The records received were for JV-1's account "Ёstrёllîtâ Gönsälёz" from July 6, 2019 to July 10th, 2019.

22. Sergeant Investigator Jacob Meyer reviewed the records from Facebook and noted that there were Internet Protocol (IP) addresses from July 6, 2019 to July 8, 2019. Sergeant Meyer noted that until 3:00 a.m. on July 7th, 2019, the IP addresses were mostly from the Chicago area. The listed IP addresses from July 8th, 2019, appeared to be from Winona, Mississippi.

23. Sergeant Investigator Jacob Meyer reviewed the most recent messages from JV-1's Facebook account. Sergeant Jacob Meyer noted that there were strings of messages with two different accounts since July 7, 2019. The accounts belonged to JV-1's mother and JV-1's uncle. The messages were in Spanish and Sergeant Investigator Jacob Meyer was assisted by Soledad Theel, a Middle School Spanish teacher, for translation. In the messages between JV-1 and her mother, JV-1 (or someone using her account) told JV-1's mother not to look for her anymore, and there was extensive arguing between them. The arguing was about JV-1 leaving and the amount of money that JV-1's mother spent to bring her from Mexico to the United States. The conversations with JV-1's uncle were similar to the conversations with JV-1's mother. JV-1 (or someone using her account) asked her uncle to tell her mother to stop looking for her. JV-1 asked her uncle not to tell "Mama Eva" (JV-1's grandmother) because JV-1 was concerned she would get sick. JV-1 also messaged her uncle that she "came here by myself with a friend that I had" and "I am going to work." JV-1's uncle told JV-1 that the police were looking for her. JV-1 told her uncle that her cell phone was at the house by her brother's shoes.

### D. JV-1's Cell Phone

24. On July 8, 2019, during the follow-up interview with JV-1's mother, JV-1's mother gave Calumet County Sheriff's Department Deputy Leslie Lemieux JV-1's cell phone and completed

a consent to search form. JV-1's cell phone was described as a Samsung Galaxy S9, black in color with a purple case.

25.     JV-1's mother had reviewed some of the contents of JV-1's cell phone prior to turning it over to Deputy Leslie Lemieux. JV-1's mother showed Deputy Lemieux that JV-1 was communicating with someone using a phone number of 678-497-8741 on the application called "WhatsApp." JV-1's brother translated the messages for Deputy Lemieux and indicated that the messages said that the person using 678-497-8741 would be there in four hours to pick up JV-1. This message was sent on July 6, 2019. There was a profile photo associated with the phone number, and it depicted two adult male Hispanic subjects in the foreground, with a third adult male Hispanic subject standing in the background. Neither JV-1's mother or JV-1's brother recognized the male subjects depicted in the photo.

26.     On July 11, 2019, Calumet County Sergeant Investigator Jacob Meyer conducted a review of the content in JV-1's cell phone. Sergeant Investigator Meyer noted there were several "selfie" type images of JV-1 on the phone. Some of the images depicted JV-1 in a provocative manner. Sergeant Investigator Meyer noted there were minimal text message conversations in JV-1's phone, and most of the messages were from JV-1's mother on July 8, 2019, asking JV-1 where she was.

27.     On July 12, 2019, Sergeant Investigator Jacob Meyer reviewed the "WhatsApp" messages contained in JV-1's phone. Sergeant Investigator Jacob Meyer located two separate conversations from July 6, 2019 with phone numbers: 958-144-7840 and 995-101-2720. Sergeant Investigator Meyer noted that JV-1 told the subjects to no longer send messages to her phone as she was planning on getting a new phone number and would let them know when she got it.

28.     Sergeant Investigator Jacob Meyer documented that there were messages between JV-1 and the phone number 52-951-178-5763. Sergeant Investigator Jacob Meyer later learned that the prefix of "52" was a Mexico prefix for phone numbers. The dates of the messages with this phone

number were from June 15, 2019 to July 6, 2019. Sergeant Investigator Meyer noted that there were several pictures being exchanged between JV-1 and an unknown male subject. JV-1 told the subject that she was 17 years of age, and the male subject indicated he was 20 years of age. Over time, JV-1 and the male subject expressed that they loved each other and wanted to get married. The images over time included nude female and male genitalia. On July 2, 2019, JV-1 sent a small screen capture of Google Maps to the subject that showed her location. Her location was pinpointed and labeled "N694 CTH J," which Sergeant Investigator Meyer recognized as JV-1's address in New Holstein, WI. The male subject sent JV-1 his location with a Google Maps capture that showed his coordinates as (33.495704, -89.730961. Those coordinates, when entered into Google Maps, show a location near Lodi Rd and US-82, outside of Winona, Mississippi. On July 5, 2019, the male subject messaged JV-1 that he could send a "Raitero" to pick her up and JV-1 told the subject that she wanted him to do so. Sergeant Investigator Jacob Meyer later learned that a "Raitero" means a person who give rides or transports people. On July 6, 2019, JV-1 again sent her location in Google Maps to the subject. The male subject responded informing JV-1 that the "Raitero" wanted her phone number so that he could contact her. JV-1 messaged that she planned to leave her phone at home and the male subject told JV-1 that he would let her know when the "Raitero" was near. JV-1 also asked the subject to not tag her in anything on Facebook so people would not know. On July 6, 2019, at approximately 6:14 p.m., JV-1 messaged the unknown subject and told him that she was going to leave her mother and asked for the "Raitero" to come at 11 in the morning.

29.     Sergeant Investigator Jacob Meyer reviewed the messages in JV-1's phone with the phone number of 678-497-8741. On July 6, 2019, at approximately 10:34 a.m., the subject messaged that he would arrive the following morning at 8:00 a.m. JV-1 responded that "Tomas" had told her that he would only need five hours to get there, and the subject said the five hours was only if she wanted to travel at night.

30.     On July 9, 2019, Sergeant Investigator Jacob Meyer met with JV-1's neighbor who witnessed her leaving the residence on July 7, 2019. Sergeant Investigator Jacob Meyer showed JV-1's neighbor the photo of the WhatsApp profile picture with the two adult Hispanic male subjects in the foreground, and JV-1's neighbor indicated the "skinnier" subject on the right side of the profile photo resembled the subject whom he had seen picking JV-1 up in the red vehicle on July 7, 2019. JV-1's neighbor said he believed the subject's hair was grayer but that he believed the photo depicted the subject who had picked her up.

**F.     Record Checks for 678-497-8741**

31.     On July 12, 2019, Calumet County Sheriff Department Sergeant Investigator Jacob Meyer served a Calumet County Circuit Court Subpoena to Sprint, who was determined to be the cellular service carrier for phone number 678-497-8741. Sergeant Investigator Jacob Meyer reviewed the records provided to him on July 17, 2019 and noted that the phone number 678-497-8741 was registered to Elvira Acero with an address of 3379 Aztec Road, Apartment 26C, Atlanta, Georgia. Sergeant Jacob Meyer reviewed the records and indicated that there were 176 outgoing calls made from July 5, 2019 to July 16, 2019. From July 5, 2019, at 11:27 a.m. (EST) to July 6, 2019, at 12:10 p.m. (EST) there were thirteen outgoing calls on the Atlanta Georgia network. From July 6, 2019, at 5:20 p.m. (EST) to July 7, 2019, 1:43 a.m., (EST) there were two outgoing calls made that were on the Chicago, Illinois network. Sergeant Investigator Meyer also noted that there was one phone call made prior to JV-1's disappearance made on July 7, 2019 at 1:43 a.m. (CST) on the Chicago network and one phone call made after JV-1's disappearance on July 7, 2019 at 3:07 p.m. (EST) which was made on the Akron, Ohio network.

32.     On July 24, 2019, Sergeant Investigator Jacob Meyer received records that were requested from WhatsApp after a search warrant was approved and executed by the Calumet County Circuit Court on July 10, 2019. The search warrant requested records relating to phone number 678-

497-8741. WhatsApp provided minimal records but reported that the phone number has had an active account since July 7, 2014. The most recent activity on the account was July 24, 2019. The device used for connection was a Samsung Android with an "anonymized" IP address. Content of messages received or sent was not available.

33. On February 20, 2020, after JV-1's recovery, Wisconsin Department of Justice-Division of Criminal Investigation Special Agent Melissa Fus requested records from the Wisconsin Statewide Intelligence Center (WSIC) regarding phone number 678-497-8741. The records received provided a second subject that was affiliated with the address for Elvira Acero as 3379 Aztec Road, Apartment 26C, Atlanta, GA. The subject was identified as: Reyes Perez, M/H, 01-06-1968. S/A Fus compared a Georgia driver's license photo of Reyes Perez and noticed that Perez's driver license photo was very similar to the male Hispanic subject depicted in the right side of the WhatsApp profile photo for 678-497-8741. This was also the same male in the photo that JV-1's neighbor previously recognized as the subject that picked JV-1 up from her residence. WSIC also checked for registered vehicles for Perez, and it was determined that Perez owned a 2017 red Toyota Corolla.

**G.    Recovery of JV-1**

34. On September 30, 2019, at approximately 5:00 p.m., Calumet County Sergeant Investigator Jacob Meyer was notified that JV-1 had been recovered in Anne Arundel County, Maryland. JV-1 was recovered at a Shell Gas Station located at 1318 Cape Saint Claire Road, Annapolis, Maryland, by the Anne Arundel County Police Department. Sergeant Investigator Meyer was advised that JV-1 was recovered at approximately 5:00 p.m. (EDT) and later learned the 911 call was placed at 16:57:09 (EDT) to the police department. Sergeant Investigator Meyer received a copy of the police report from Anne Arundel County Police Department which documented the recovery of JV-1. The police reports were narrated by Officer Raiford and Officer Brightbill. The following information was documented in the reports.

15

35.     During the initial contact with JV-1, Officer Raiford was advised that JV-1 spoke very little English.  Officer Raiford then arranged for a telephonic Language Line Operator to assist him with obtaining information from JV-1.  JV-1 disclosed that she was kidnapped approximately three months earlier and that over the course of the those three months, she had been sexually assaulted several times by three adult male individuals who had just let her go.  JV-1 said they dropped had dropped her off from a black vehicle approximately 15 minutes prior to the call being placed to the police.

36.     JV-1 was wearing blue jeans, a gray shirt that was torn near her stomach area and no shoes.  JV-1 disclosed that the men scratched her arms while in the vehicle and tore her shirt and officers observed red colored scratch marks on both of her arms.  JV-1 report that she had been sexually assaulted approximately five times.  JV-1 was reportedly hysterical, crying and saying she wanted to see her mother.  JV-1 was then transported to the Anne Arundel Medical Center by ambulance for medical treatment.

37.     Calumet County Sergeant Investigator Jacob Meyer had phone contact with Anne Arundel County Police Detective Shelton Jones while Detective Jones was at the hospital with JV-1. Detective Jones advised Sergeant Investigator Meyer that JV-1 had stated that when she left home, she was a virgin, but now she no longer is.  JV-1 reported that it had been approximately two weeks since the suspects sexually assaulted her.  JV-1 stated the men never took her to a hotel or had her meet anyone else.  JV-1 stated the suspects housed JV-1 at various houses over the course of the past three months. JV-1 was kept in a dark room most of the time, and occasionally one of the three male suspects would come into the dark room and sexually assault her.  JV-1 did not know the males' full identities but indicated that the man who drove the red car was "Felipe" and another male suspect was "Immanuel." JV-1 stated she did not know the third man's name and said all the male suspects changed

names, so she was not sure of their real names. JV-1 described the three male suspects as Hispanic males around 40 years of age or older.

38. Special Agent Melissa Fus also spoke with Detective Shelton Jones and learned that he believed JV-1 was wearing a t-shirt that had a Mississippi tag on it. Detective Shelton did not have any documentation or photographs of the shirt and was unable to describe the shirt further but remember the state of Mississippi on it. Detective Shelton indicated that JV-1 reported that one of the suspects purchased her a shirt at a gas station.

39. JV-1 was housed at the Waxter Children's Center from October 1st, 2019 until October 11, 2019. On October 11, 2019, JV-1 was escorted to the airport and then turned over to UMOS Milwaukee Advocate Huelmely DeJesus at the airport. DeJesus then flew with JV-1 back to Wisconsin. DeJesus indicated that JV-1 was wearing the navy and khaki uniform from the Waxter Center and had no additional property or bags with her.

**H.   Forensic Interview of JV-1**

40. On October 17, 2019, Sergeant Investigator Jacob Meyer attended a forensic interview with JV-1. The interview was conducted by Executive Director Amanda Didier at the Lakeshore Regional Child Advocacy Center in Saukville, WI. The following was the information disclosed by JV-1 during the interview.

41. JV-1 said she came to the United States from Mexico approximately two months ago. While at her mother's residence, JV-1 stated she played a game on her phone called "Free Fire." JV-1 said she was not in school at the time, so she played the game all the time. JV-1 said she met friends on the game, and that was how she met the people that kidnapped her. JV-1 said she was playing with these same individuals regularly and she trusted them. JV-1 said the people took advantage of her trust and then "proposed some things" as she told individuals that she was lonely and sad, especially at nighttime since she didn't know anyone where she lived. JV-1 stated the individuals told her that if

she wanted to leave, they would take her to a nice house, and she would have nice things and a great life.

42.     JV-1 indicated that the two people she talked to regularly on "Free Fire" identified themselves as "Manuel" and "Felipe" in the game.  JV-1 said that the individuals told her that they were around the same age she was, and she was very excited to go live with them.  JV-1 stated "Manuel" and "Felipe" sent someone to pick her up one day after this discussion.  JV-1 said her mother was not home when she left the residence.  JV-1 described that a man showed up at her house and said, "I came for you" and then told her to get into the car.  JV-1 said this "took her by surprise" as she was not expecting anyone to come pick her up.  JV-1 stated the individuals never told her when they were going to come.  JV-1 said when the man showed up, he told her that he was sent by the people she was chatting with to pick her up.   JV-1 said she did not take anything from inside the house and just left exactly as she was because she thought she would be going back home at some point.  JV-1 said the suspects knew her address in Wisconsin because she told them after they asked for it and she trusted them.  JV-1 said the male suspects simply asked where she lived as part of a conversation.  JV-1 said the man was driving a red four-door car when he picked her up.  JV-1 said that the man who picked her up told her to leave her cell phone at home since they would give her a new one.  JV-1 stated the man who picked her up had a phone of his own, however she did not know what kind it was.

43.     JV-1 stated they traveled in the car for approximately one whole day and she did not know what state they were in because she had just come from Mexico and did not know this country yet.  JV-1 said they eventually arrived at a house, which she consistently described as "ugly."  JV-1 stated she was very scared and felt that things were no longer right.  Upon arriving to the "ugly" house, JV-1 observed two other men at the house who were also adults.  JV-1 asked the men where the two teenaged boys/young adult males whom she had talked to were.  The male subjects told her that those two people were inside, however this was a lie; there were only the three older men.  JV-1 said that

18

once she realized they lied to her, she was not sure if she would make it out alive and was scared that she would never see her family again. JV-1 described the men as being around 50 years old, and she stated that they were the only people she ever saw in the house or for the three-month duration. JV-1 said the male subjects did not use names for each other, so she did not know their names.

44. Once inside of the "ugly" house, JV-1 stated the men took her to an "ugly room" where she was forced to stay. JV-1 said the male suspects kept her locked in the room for approximately three months. JV-1 said the men made threats to her indicating that they would do things to her family if she told anyone. JV-1 stated she cried every day in the house and wanted to go home to her mother, and she often begged the men to let her go. JV-1 was not sure she would live and was worried that the men might kill her at some point since the male suspects told her something bad would happen to her family if she told anyone about this. JV-1 also recalled the suspects mentioning that she once heard the men talking about how they purposely used profile pictures of other people so that they could not be recognized by anyone.

45. JV-1 described the "ugly room" had nothing inside of it besides a mattress with a blanket on it with no other furniture. JV-1 said there was a bathroom in the room too, so she was never allowed to leave the room. JV-1 stated food was always brought to her, which was typically canned food of some kind. JV-1 stated she never slept or ate very well in the room.

46. JV-1 described being sexually assaulted while locked in the "ugly room". JV-1 said all three of the male suspects assaulted her and if she did not let them then the suspects would hit her. JV-1 stated she could not remember much about the sexual assaults and said it was dark when they assaulted her so she could not see who was doing it every time. JV-1 estimated that the sexual assaults occurred approximately three times. JV-1 said the suspects would pull her hair and hold her hands behind her back during the assaults. JV-1 described that the male suspects "abused" her by having

"sexual relations" with her using their "intimate part" and her "intimate part". JV-1 indicated that the "intimate part" was not her buttocks.

47.     After three months, JV-1 said she thought she was going to go crazy and she wanted out. At one point, the men came inside the room and told her that the police and her mother were looking for her and they were afraid the police would find them. The men told JV-1 that they needed to get her out of the house and they left at night. JV-1 said they walked for a while and then ended up traveling in a black car. JV-1 said if she wanted food, she had to eat in the car, and if she wanted to go to the bathroom, it had to be outdoors. JV-1 stated they spent another day traveling in the car before they told her they were going to just leave her on the street. While driving in the vehicle, JV-1 stated the men pulled her hair, scratched her arms, tore her blouse, and threatened to do something to her family if she told anyone.

48.     JV-1 stated that the men told her it was very dangerous to get out so they just kept things like crackers in the car and they would give her those if she was hungry. JV-1 stated she "thought" they may have stopped at gas stations, but JV-1 could not recall any landmarks, lakes, stores, etc. along the way.

49.     JV-1 stated the men finally dropped her off on the side of a road, and she walked until she came upon a gas station. JV-1 said she found a man who worked there and told him she needed to use a phone to call the police. When the police came, they asked her questions and then took her to a hospital where she was able to talk to her mother on the phone.

**I.     Interview of JV-1 on February 19, 2020**

50.     On February 19, 2020, Wisconsin Department of Justice-Division of Criminal Investigation Special Agents Melissa Fus and Ricardo Tijerino, as well as Calumet County Sergeant Detective Jacob Meyer, met with JV-1. JV-1 provided the following additional information regarding this investigation.

51.     JV-1 said she spoke with three different subjects on a regular basis on the game called Free Fire for a little over a month.  Two of the three subjects told her they were close to her age (16 or 17), and the third subject said he was 20 years old.  JV-1 said she talked to the subjects on a regular basis and she started to trust them as she wanted friends.  JV-1 recalled the names of two of the subjects as "Felipe" and "Manuel."  JV-1 said they would ask questions about her life and she would tell them where she lived and details about her family.  JV-1 said one day while on the game, one of the subjects asked JV-1 if she was interested in a different and better life.  JV-1 said at the time she did not like living at her residence, she was new to the states, and she was lonely.  The subjects told her they would take her to a much bigger house and better life.  JV-1 said she was home alone and playing the game and one of the subjects said, "We are coming to get you."  Then she received another message indicating they were there.  JV-1 said they had talked about coming to get her before, but she was shocked that they actually came to get her as she did not believe they were serious about picking her up, nor did she agree to it.  JV-1 said she did not take anything with her as she believed she would be returning home and was only visiting.

52.     JV-1 does not recall any other specifics of the vehicle that she was picked up in except for it being a red four-door vehicle.  JV-1 said there was no one else inside of the vehicle when she was picked up.  JV-1 described the male subject as a Hispanic male approximately 50 years of age wearing all black clothing.  JV-1 said they travelled for approximately one and half days.  JV-1 said they only stopped for gas.  JV-1 said the subject walked inside of the gas station after getting gas, and she never saw whether he used a credit card.  JV-1 was unable to describe any particular gas stations that they stopped at.  JV-1 said the male subject would also purchase food from the gas station.  JV-1 estimated that they traveled approximately four to five hours after she was picked up at her house until the subject stopped at the gas station for the first time.  During the car ride, JV-1 said the male subject never threatened her, and they talked about her family.  JV-1 she would occasionally ask where they

were going, but JV-1 could not recall what he told her in response. JV-1 said the subject used his cell phone and was texting, but she never saw him talk to anyone on the phone.

53.    JV-1 was unable to describe the "ugly" house that she was taken to because they arrived there at night. JV-1 said the house had two floors and she was not sure if there was a basement. JV-1 said the house was "ugly" because it was old. JV-1 said when she arrived to the house there were two other guys in the residence. JV-1 said the other males were Hispanic and were approximately 50 years of age. The male subjects only spoke Spanish and she believed them to be Mexican based on their accents and way of speaking. JV-1 realized that there was no one else her age at the residence so she became scared. JV-1 said one of the males screamed at her and told her that she had been kidnapped and she became scared "shitless." JV-1 said the male subject continued and told her that this was not what she thought it was going to be and they were going to hold her and keep her there the rest of her life and she was never going to see her family again.

54.    JV-1 was then taken to the "ugly" room, which was really dark as there were no lights. JV-1 said as she was put in the room, one of the subjects told her that she was not going anywhere and that they were going to do what they wanted with her. JV-1 said she only saw the suspects when they would bring her canned food or when they would sexually assault her. JV-1 said the room that she was held in was on the first floor. The room had a mattress on the floor and a window which was on the upper portion of the wall so she was not able to see out the window. JV-1 said the door to the bedroom was locked from the outside and there was a bathroom in the bedroom, but no shower. JV-1 said she never took a shower from the time that she was picked up or changed her clothes. While in the bedroom, JV-1 said she only heard the three male voices at the residence. JV-1 said she could hear the men leaving occasionally but she was not sure if someone stayed back. JV-1 said the male subjects stayed at the residence most of the time. JV-1 said she was never allowed out of the "ugly" bedroom.

55.     JV-1 said the sexual assaults started approximately one week after she was taken to the "ugly" house.  JV-1 said she initially knew how many times she had been assaulted but then she lost count because she was trying to forget the incident.  JV-1 said she was assaulted by one male at a time and they never wore condoms. JV-1 said they were violent with her and threatened to hit her if she did not let them have their way with her.  JV-1 said she cried the entire time as she missed her family and the male subjects continuously told her that she would never see her family again.  JV-1 said she never received medical attention while she was there.

56.     JV-1 was then asked about accessing her Facebook account while she was gone. JV-1 said when she arrived to the "ugly" house the male subjects asked for her Facebook account information including her passwords and she never had access to an electronic device while she was there.  JV-1 said the suspects told her they were going to create a fake Facebook page for her so they could communicate with her mother.

57.     JV-1 did not recognize the WhatsApp phone number of 678-497-8741. S/A Tijerino read some of the WhatsApp messages that Sergeant Jacob Meyer documented in his report from JV-1's cell phone.  JV-1 said she recalled the messages.  JV-1 again said that she never took the messages seriously when the subjects would say they would come get her, which was why she was shocked when the subject showed up.  JV-1 also did not recognize the phone number from WhatsApp of 951-178-5763 or know who the phone number belonged to.   JV-1 was showed the photo from the WhatsApp profile picture from phone number 678-497-8741 which depicted three male Hispanic subjects.  JV-1 recalled the photo from WhatsApp but said none of the male suspects that kidnapped her or sexually assaulted her were depicted in the photo.  JV-1 said at some point while at the "ugly" house, one of the male subjects told her that the WhatsApp photo was taken from someone else's profile.

58.     Special Agent Tijerino then listed the following states and cities to determine if JV-1 recalled anything about them being mentioned: Tennessee; Florida; Kansas; Mississippi; Nashville; Atlanta; Orlando; Chicago; Winona; or Kansas City.  JV-1 said she remembered Chicago because of the tall buildings.  JV-1 said they drove through Chicago and said she knew it was Chicago because she had been there once before and the male driver told her it was Chicago.  JV-1 said she recalled Winona, Mississippi coming up in conversation but she could not recall the context, whether the subjects lived there, or used to live there, or spent time there.

59.     JV-1 was showed a photo that depicted her with a male subject that was recovered from a Facebook page named "Estrellitha Thowp," believed to be a fake account created by the subjects and meant to appear to be an account used by JV-1.  This photo was located by JV-1's mother while JV-1 was missing.  JV-1 did not recognize the photo but indicated that she was the female depicted in the photo.  JV-1 said she believed the photo was digitally edited to crop a known photo of her into a photo with the unknown male subject.  JV-1 the image of her face used to create the altered photo as a photo that she sent to the subjects on Free Fire.  JV-1 also said the male in the photo resembled a male depicted in a photo the suspects had sent her, whom she expected she would be meeting when one of the subjects picked up from her residence in July 2019.

## PARAMETERS OF THE SEARCH

60.     This application seeks the identification of all Google, LLC accounts and IP addresses that accessed and/or used servers owned, controlled, or operated by Google, LLC, during the time period from July 1, 2019 at 12:00 a.m. (UTC) through July 9, 2019 at 11:59 p.m. (UTC) AND from September 30, 2019 at 11:59 p.m. (UTC) to conduct searches that included the search terms listed in Attachment A.  The terms are not case sensitive, such that Google LLC would be directed to include any search of any of the above regardless of whether the search was conducted using capitalized letters

in whole or in part of the actual search. In addition, the proposed search procedure sets forth a tiered, at first anonymized, search protocol by which Google would provide the search warrant results.

61. The date parameters proposed by this application include two distinct time periods. The first begins the day before JV-1 communicated her location to the subjects online and ends a couple of days after they picked her up and drove her out of state. The second includes September 30, 2019, when JV-1 was recovered in Maryland, as well as a few days before and after that date.

62. The search terms proposed are tailored to JV-1's name, Facebook account name, residential address, and telephone number. These specific search terms would not likely be searched unless there was an interest in JV-1 and/or her residence in rural Wisconsin.

63. Based on my training and experience, it is common for individuals who commit kidnapping and child enticement offenses to conduct Internet searches in order to obtain information about a victim or the victim's family in preparation for the commission of a crime, as well as obtain directions to specific locations where they intend to commit their crimes. Criminals also commonly conduct searches relating to their illegal activities during and after conducting their criminal activities in order to ascertain whether their illegal activities have been detected.

64. In this case, I am aware that the subjects groomed JV-1 via online and telephonic communications and that she eventually provided her location to them. Based on the evidence gathered to date, I also believe that the subject who picked JV-1 up in New Holstein had to travel a significant distance from out of state to find her, and he would likely would have needed directions to reach her remote address in rural Wisconsin. Furthermore, based on statements that the subjects made to the victim shortly before they abandoned her in Maryland, to the effect that they believed law enforcement may be on to them, it appears likely that the subjects were searching for news articles or other online postings about JV-1, her home address, and/or her family. Based on these events and my training and experience, I also believe it is likely that the subjects continued to search for relevant

media coverage and postings about the victim after they abandoned her.

65.    I am aware that Google is one of the world's most popular search engines.  Google maintains google.com, a website which is accessible to most of the world, as well as localized and regional search domains.  Google also maintains a web mapping service, Google Maps, that allows a user to search for locations by address, description, or GPS coordinates.  Google Maps offers satellite imagery, aerial photography, street maps, interactive panoramic views of streets, real-time traffic conditions, and route planning for traveling by foot, car, bicycle, and air or public transportation. Both JV-1 and one of the subjects of this investigation used Google Maps in July 2019 to communicate their locations to one another.

66.    Based on the forgoing, I request that the Court issue the proposed search warrant.

## SEARCH PROCEDURE

67.    The requested search warrant sets forth a Search Procedure where: (1) the Service Provider will produce an exact duplicate of information associated with the Subject Account(s) to law enforcement; (2) law enforcement personnel will review that exact duplicate to determine what information may be further copied (*i.e.*, seized) pursuant to the search warrant; and (3) then law enforcement personnel will seal the exact duplicate produced by the Service Provider and will not review it further absent an order of the Court.  This Search Procedure is authorized by and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B) (authorizing copying of electronically stored information and later review of the media) and 18 U.S.C. § 2703(g) (presence of a law enforcement officer is not required for warrant execution).

68.    I believe that this Search Procedure is necessary to minimize any interference with the business activities of the Service Provider and service to its subscribers at-large.  As a Special Agent working on this investigation, I am knowledgeable, trained, and experienced in identifying communications and other information relevant to the Subject Offenses under investigation and

within the scope of the search warrant. The personnel of the Service Provider are not. I am also trained and experienced in, and responsible for the manner in which the information must be preserved and analyzed (*e.g.*, chain of custody) in this criminal investigation. Again, the personnel of the Service Provider are not. Therefore, in lieu of law enforcement searching the vast network of the Service Provider at the premises of the Service Provider, the requested warrant sets forth the Search Procedure.

69.     Because the warrant will be served on the Service Provider who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**ATTACHMENT A**

This warrant applies to information associated with Google accounts and Internet Protocol ("IP") addresses that accessed and/or used servers of Google, LLC, to conduct searches that included the following search term (which is not case-sensitive) for the time period from July 1, 2019 at 12:00 a.m. (UTC) through July 9, 2019 at 11:59 p.m. (UTC) AND from September 27, 2019 at 12:00 a.m. (UTC) to October 3, 2019 at 11:59 p.m. (UTC) for a search of any of the following terms:

N694 CTH J
Melissa Vasquez Gonzalez
Melissa Vasquez Gonzalez
Estrellita Gonsalez
920-375-6503

without respect to capitalization, that is stored, owned, possessed, maintained, controlled, or operated by Google LLC, a company headquartered in Mountain View, California.

**I.**      **INFORMATION TO BE PROVIDED BY THE SERVICE PROVIDER**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any records, files, logs, or information that have been deleted but are still available to the Service Provider, the Service Provider is required to disclose the following information to the government for each identifier listed in Attachment A:

     A.      Identification of all Google accounts and Internet Protocol ("IP") addresses that accessed and/or used google.com to search for the identifiers listed in Attachment A for the time periods listed in Attachment A, including the identification of which account or IP address accessed and/or used which search website and which identifier was searched for;

     B.      Identification of the Google cookie ID with respect to each of the identified searches;

     C.      For all identified Google accounts:

         1.      All subscriber and payment information, including full name, e-mail address (including any secondary, alternate, or recovery email addresses), physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, telephone number, websites, screen names, user identification numbers, security questions and answers, registration IP address, payment history, and other personal identifiers;

         2.      All past and current usernames and other names associated with the account;

         3.      The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

         4.      All transactional records associated with the account, including any IP logs or other records of session times and durations;

5. The types of service utilized by the user;

6. All subscriber "change history" associated with the account;

7. The length of service (including start date) and the means and source of any payments associated with the service (including any full credit card or bank account number); and

8. All records pertaining to communications between the Service Provider and any person regarding the user or the user's account with the Service Provider, including contacts with support services, records of actions taken, and investigative or user complaints concerning the subscriber.

9. Google is further required to disclose the information for any forwarding or fetching accounts of the Account; all other Google accounts linked to the Account because of cookie overlap; all other Google accounts registered with the same phone number as the Account; all other Google accounts registered with the same recovery, alternate, or secondary email address as the Account; all other Google accounts for which the Account is the recovery, alternate, or secondary email address; and all other Google accounts that share the same creation Internet Protocol (IP) address as the Account (collectively, "Linked Accounts").

## II.   **SEARCH PROTOCOL**

The Search Procedure shall be as follows: (1) The Service Provider will produce an exact duplicate of information associated with the search terms/subject account(s) to law enforcement. (2) Law enforcement personnel will review that exact duplicate to determine what information may be further copied (*i.e.*, seized) pursuant to the search warrant. (3) Law enforcement personnel will then seal the exact duplicate produced by the Service Provider and will not review it further absent an

order of the Court. This Search Procedure is authorized by and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B) (authorizing copying of electronically stored information and later review of the media) and 18 U.S.C. § 2703(g).

Google, LLC shall provide responsive data, as described in Attachment A, pursuant to the following process:

A. Google, LLC shall query search history data based on the parameters described in Attachment A.

B. For each identified search query, Google shall produce anonymized information specifying each search query and the corresponding date, time, location, Google host, URL request and referrer, and user agent, if available (the "Anonymized List"). The "Anonymized List" shall not include the identification of Google accounts.

C. Law enforcement shall review the Anonymized List to remove searches that appear irrelevant to the investigation.

D. For those searches identified as relevant pursuant to the process described above, law enforcement may request that Google provide the information specified above in Sections I.A, I.B, and I.C for the Google account(s) and/or Internet Protocol addresses associated with each identified search.

## III. PARTICULAR THINGS TO BE SEIZED BY THE GOVERNMENT

All information described above in Section II that constitutes evidence of violations of violations of 18 USC § 1201 (a)(1), (g) (Kidnapping); 18 USC § 2422(b) (Coercion and Enticement); and 18 USC § 2423(a) (Transportation of Minors), from inception of the account through the present, including, for each identifier listed on Attachment A, information pertaining to the following matters:

a. Evidence of the Subject Offenses, preparatory steps taken in furtherance of such activity (including reconnaissance of JV-1 and/or her contact information), and steps

taken after such activity to hinder and prevent apprehension and identification, or evidence that may refute the subscriber's involvement in such activity;

b.      Evidence indicating how and when any relevant account was accessed or used, to determine the geographic the geographic and chronological context of account access, use, and events relating of the crimes under investigation and to the account owner;

c.      Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

d.      The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s); and

e.      Evidence indicating the state of mind of the person(s) involved with the Subject Offenses.